UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
:
UNITED STATES OF AMERICA                            :
                                                    :     08 CR 1327 (HB)
            - against -                             :     OPINION & ORDER
                                                    :
HECTOR RIVERA,                                      :
                                                    :
            Defendant.                              :
                                                    :
------------------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

      Defendant Hector Rivera ("Rivera") is one of seven remaining defendants charged in a seven-count superseding indictment with, inter alia, conspiracy to violate the Hobbs Act, 18 U.S.C. §1951, in connection with the hijacking of one and attempted hijacking of another Federal Express tractor-trailer truck, both on the west side of Manhattan.  Rivera moves to suppress a single statement allegedly made to federal agents following his arrest on December 4, 2008.[1]  For the reasons that follow, Rivera's motion is GRANTED.

### I.     FACTUAL BACKGROUND

      On the night of December 4, 2008, agents of the FBI decided to "take down" an ongoing investigation in which Rivera was a suspect.  On that evening they arrested approximately twelve suspects, including Rivera, who was arrested without incident in the area of Hollis, New York.  Tr. of August 12, 2009 Hrg. ("Tr.") 7.  Rivera was transported by car to FBI headquarters at 26 Federal Plaza in Manhattan for processing. Tr. 7, 34.  At a suppression hearing held on August 12, 2009, Special Agent Michael Zuk ("Zuk"), one of two lead "case agents" responsible for the investigation, testified that in preparation for the multiple arrests, agents from several different squads were called to assist with the arrests and processing of the suspects.  Tr. 7.  The assisting agents were instructed to conduct the initial arrest processing, *i.e.* obtaining fingerprints, photographs, and pedigree information from the arrestees, but to allow Zuk or his fellow case agent Karma Smith to "substantively interview" those who were arrested. Tr. 7-8.

---

[1] Rivera initially moved to suppress an identification made pursuant to a photographic array.  This motion has been rendered moot by the Government's representation to the Court that the photo identification will not be introduced at trial. See Government's Mem. in Opp'n. at 1.

The procedure was followed in Rivera's case. Special Agent Peter Casson ("Casson"), one of the agents who had arrested Rivera, and Special Agent Byers took Rivera through the initial intake process by obtaining biographical pedigree information, photographs and fingerprints. Casson testified that he then read aloud to Rivera each of the Miranda rights listed on a form titled "Advice of Rights" as Rivera read along [2] Tr. 36. Rivera then initialed next to each of the listed rights to confirm that he understood them. Tr. 36. Casson did not ask Rivera if he wished to waive any of his rights. Tr. 37. Instead, Casson left Agent Byers in the interview room with Rivera and sought out Zuk. Tr. 36.

Zuk entered the interview room sometime between 12:35 and 1:00 a.m. According to Zuk's testimony, Casson informed him that the booking paperwork was complete and that Casson and Byers had advised Rivera of his rights "but they stopped there." Tr. 8, 17. Neither Zuk nor Casson could recall whether it was specifically communicated to Zuk that Rivera had not invoked his rights, and Zuk did not recall specifically asking the other agents if he had. Tr. 17-18, 20. Rather, Zuk testified that his "conversation with Special Agent Casson indicated . . . that Mr. Rivera had been advised completely, but . . . they had not initiated the discussion of whether he wished to waive those rights." Tr. 19-20.

Zuk then introduced himself to Rivera and commented that Rivera had initialed the "Advice of Rights" form. Tr. 10, 31. Rivera acknowledged that he had. Tr. 10. Zuk then told Rivera that "the next part of the process was one of the more important parts" because Rivera would need to decide whether to waive his rights and speak to the agents. Id. At this point, Rivera "sat silent" because Zuk "asked him to." Id. Zuk then explained that he had been investigating Rivera for almost a year and that the evidence against him, in Zuk's view, was "overwhelming": Zuk told Rivera that the agents had wiretap intercepts of his phone, consensual recordings made by cooperating witnesses, video surveillance, photographic surveillance and other evidence. Tr. 10. Zuk then told Rivera that he was facing serious charges, and that if he was convicted it was Zuk's belief that he would likely spend the rest of his life in prison. Tr. 10-11. Finally, Zuk told Rivera that he wished to speak with him because based on his investigation he thought it was likely that Rivera could provide useful information about the other subjects of the investigation including "people from the diamond district and multimillionaires." Tr. 11.

---

[2] The Government introduced at the suppression hearing a form titled "Advice of Rights" bearing Rivera's initials next to each of seven enumerated rights and witnessed by Casson and Byers at 12:36 a.m. on December 5, 2008. GX-1. The signature line under the section titled "Waiver of Rights" is blank."

2

Zuk explained to Rivera that "there were very few ways in the federal system to reduce his exposure to jail time, and that cooperation with the government was one way in which he could do that." Tr. 27.

At this point, according to Zuk's testimony, "Rivera quietly and calmly stated that it was his belief that no matter what he would say to me, he would spend the rest of his life in jail." Tr. 11. Zuk then asked Rivera, if he meant to indicate that he did not wish to speak, and Rivera indicated that was correct.[3] Tr. 12. The interview ceased at this point.

## II.   DISCUSSION

The Fifth Amendment to the Constitution provides in part that no "person . . . shall be compelled in a criminal case to be a witness against himself." U.S. Const. Amend. V. As far back as Miranda v. Arizona, the Supreme Court determined that the "in-custody interrogation of persons suspected of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. 436, 467 (1966). There, the Court held that "that the prosecution may not use statements made by a suspect under custodial interrogation unless: (1) the suspect has been apprised of his Fifth Amendment rights; and (2) the suspect knowingly, intelligently, and voluntarily waived those rights." United States v. Plugh, 576 F.3d 135, 140 (2d Cir. 2009) (citing Miranda, 384 U.S. at 444-45). The "opportunity to exercise" the right to remain silent and to the presence of counsel "must be afforded to [the suspect] throughout the interrogation," and if such rights are exercised "the interrogation must cease." Miranda, 384 U.S. at 479.

As discussed below, the statement that Rivera seeks to suppress here was made in the context of custodial interrogation, and thus to be admissible at trial, the Government must establish, by a preponderance of the evidence, that the defendant knowingly and intelligently waived his privilege against self-incrimination. Colorado v. Connelly, 479 U.S. 157, 169 (1986). The Court must presume that the defendant did not waive his rights. North Carolina v. Butler, 441 U.S. 369, 373 (1979). The instant motion turns on whether the allegedly inculpatory statement that Rivera seeks to suppress and the Government seeks to introduce—namely, "I believe that no matter what I say to you, I will spend the rest of my life in jail"—constituted a

---

[3] In Agent Casson's testimony, the chronology differed slightly. Casson testified that in response to Zuk's remarks, "Mr. Rivera indicated at that point that he did not wish to talk to us. He did not wish to waive his rights and he then -- then he made a comment something to the effect that it doesn't matter what I say, I'm going to prison for the rest of my life anyway." Tr. 37.

3

waiver of Rivera's constitutional privilege against self-incrimination, notwithstanding that Zuk understood the statement as an ambiguous invocation of his right to silence and Rivera confirmed that interpretation to be correct. The statement cannot be at once a waiver and an invocation of the defendant's constitutional rights, and therefore it must be suppressed.

**A.    Rivera was Properly Advised of his Miranda Rights and did not Invoke them Prior to Zuk's Questioning.**

As an initial, factual matter, I find that Rivera was properly advised of his rights under Miranda. Casson testified that he personally advised Rivera of his rights by reading them aloud while Rivera read along, and that Rivera acknowledged his understanding of each right by initialing the "Advice of Rights" form in the presence of Agents Casson and Byers. I have no reason to doubt the veracity of this testimony which is corroborated by Zuk's testimony and the "Advice of Rights" form initialed by Rivera and received into evidence at the hearing.[4]

Furthermore, there is no evidence in the record to indicate that prior to Zuk's arrival in the interview room Rivera invoked his right to silence or to the presence of an attorney. Although Zuk could not recall specifically asking Casson whether Rivera had invoked his rights, both agents testified to clear recollections that Rivera had not. There is no indication that Rivera refused to answer pedigree questions which has been held to constitute an invocation of the right to silence, see United States v. Montana, 958 F.2d 516, 517 (2d Cir. 1992), or made ambiguous statements that arguably invoked his right to counsel. See United States v. Plugh, 576 F.3d 135, 142 (2d Cir. 2009) (ambiguous statement "I am not sure if I should be talking to you" combined with refusal to sign waiver constituted invocation or right to counsel). Accordingly, I find that Rivera did not invoke his right to silence or to the presence of counsel prior to Zuk's conversation with him.

**B. Rivera was Subjected to Custodial Interrogation**

Agent Zuk's statements to Rivera about what's in it for him if he talked constituted custodial interrogation as the term has been defined by the Supreme Court and the Second Circuit. There is no dispute that Rivera was "in custody" following his arrest and during his

---

[4] I thus do not credit Rivera's affidavit in which he states that "at no time during [the] interview did the agent give [him] his Miranda warnings." Aff. of Hector Rivera, dated May 21, 2009 ("Rivera Aff.") ¶8. Rivera's self-serving affidavit, not subject to cross examination, directly contradicts the agent's testimony and the rights advisory form in evidence. See Id. at ¶9 ("The agent then questioned me about this case without . . . providing [me] with anything to review regarding my rights.") On the evidence introduced at the hearing, I find Rivera was properly advised of his Miranda rights.

4

processing at 26 Federal Plaza because he was not free to leave. See Miranda, 384 U.S. at 444 (custody involves the deprivation of "freedom of action in any significant way"); United States v. Kirsteins, 906 F.2d 919, 923 (2d Cir.1990) (noting that the relevant inquiry in considering whether questioning constitutes "custodial interrogation" is "whether a reasonable person in the same situation would have believed that he was not free to leave").

Less clear, however, and what makes this case more complicated, is whether Rivera was subjected to "interrogation." "'The term interrogation under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." Acosta v. Artuz, 575 F.3d 177, 189 (2d Cir. 2009) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).  Although "'the latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police' . . . police conduct would not qualify as interrogation simply because it 'struck a responsive chord' in a defendant." Id. (quoting Innis, 446 U.S. at 301). Instead, to be the subject of "interrogation" a suspect's statement must be "the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." Innis, 446 U.S. at 301.

"The collection of biographical or pedigree information through a law enforcement officer's questions during the non-investigative booking process that typically follows a suspect's arrest . . .does not ordinarily implicate the prophylactic concerns of Miranda." Rosa v. McCray, 396 F.3d 210 (2d Cir. 2005) (citing Muniz, 496 U.S. at 601). This is the case whether or not the information gathered turns out to be incriminating in some respect. Id. So we can set aside the agents' general pedigree questions that preceded Zuk's entry into the interview room; those questions did not constitute "interrogation" under Miranda.

The same cannot be said of Zuk's statements to Rivera. In Montana, after two suspects were arrested and one of them refused to answer any pedigree questions in connection with his booking (which the Circuit later found to constitute an invocation of his right to silence), the arresting agents transported the suspects to the courthouse for presentment and, in transit, told them they could help themselves by cooperating with the investigation. Montana, 958 F.2d at 517. The Court of Appeals held that the agents' "unsolicited statement informing the defendants that any cooperation would be brought to the attention of the Assistant United States Attorney

5

constituted 'interrogation.'" Id. (citing United States v. Johnson, 812 F.2d 1329, 1331 (11th Cir. 1986) (officer's statement suggesting that cooperation would be beneficial constituted interrogation); see also, United States v. Plugh, 576 F.3d at 144 (defendant was subjected to interrogation where agents "repeatedly [told] the defendant that any cooperation would be brought to the attention of the AUSA" and that "if he wanted to make any statements this was the time.")

The same conclusion obtains here. Zuk informed Rivera that based on the strength of the case against him and the seriousness of the charges, if convicted Zuk believed that Rivera would be sentenced to life in prison. Zuk further informed Rivera that in the federal system there were "few ways to reduce his exposure to jail time, and that cooperation with the government was one way in which he could do that." Tr. 27. Finally, Zuk testified that in his experience "if an individual is given an opportunity to see the entirety of his circumstances" he may be more likely to cooperate and that he thought Rivera would be more likely to do so if he knew the strength of the Government's evidence against him. Tr. 29. Under the reasoning of Montana, Zuk's questions were "reasonably likely to elicit an incriminating response" from Rivera and thus constituted "interrogation." 958 F.2d at 517; see also, Plugh, 576 F.3d at 144. That Zuk hoped the incriminating statements would be preceded by a waiver of rights does not change the fact that his speech constituted interrogation. Consequently, because the defendant's statement was responsive to custodial interrogation, Rivera's statement is not admissible unless the Government establishes that Rivera validly waived his Miranda rights.

**C. Rivera's Statement did not Constitute a Waiver of Rights**

As noted, the prosecution has the burden to prove a valid waiver of Miranda rights by a preponderance of the evidence. United States v. Gaines, 295 F.3d 293, 297 (2d Cir. 2002). The Court's determination must be made upon consideration of the "totality of the circumstances" and in light of the "presumption that the defendant did not waive his rights." United States v. Scarpa, 897 F.2d 63, 68 (2d Cir. 1990). Miranda made clear that "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." 384 U.S. at 475. "While merely answering questions after Miranda warnings have been given does not necessarily constitute a waiver, no express statement of waiver is required." Scarpa, 897 F.2d at 68-69 (citing Butler, 441 U.S. at 373). The Supreme Court made clear in Butler that in some cases a valid waiver may be inferred

from "silence, coupled with an understanding of [the defendant's] rights and a course of conduct indicating waiver." 441 U.S. at 373 (emphasis added).  In short, to meet its burden to prove a valid waiver the Government must point to some affirmative conduct of the defendant, *i.e.* words or actions, from which a knowing and intelligent waiver may be clearly inferred.  See, e.g., Scarpa, 897 F.2d at 68 ("relaxed and friendly" post-warning conversation with law enforcement constituted waiver); United States v. Silva, 715 F.2d 43, 49 (2d Cir. 1983) (implied waiver where suspect answered questions willingly); United States v. Britto, 592 F.Supp. 2d 582, 587 (S.D.N.Y. 2008) (implied waiver where suspect engaged officer "in a dialogue about the investigation"); United States v. Dosanjh, No. 08 Cr. 211 (AKH), 2008 WL 5209991, *5 (S.D.N.Y. Dec. 11, 2008) (implied waiver where defendant responded to agent's questions).

      Here, Rivera both initialed the rights advisory form and acknowledged that he had been advised of his rights and that he understood them.   Although clearly sufficient to establish that Rivera was informed of his Miranda rights, this conduct is insufficient to constitute a waiver itself.  See LaFave et. al., Criminal Procedure, §6.9(d) (3d ed. 2007) ("The point, quite simply, is that an understanding of rights and an intention to waive them are two different things, and the latter should not be inferred merely because the former is now clearly established."); Tague v. Louisiana, 444 U.S. 469, 470 (1980) (per curiam) (no waiver where record merely showed defendant made incriminating statement after being advised of rights).  Furthermore, Agent Casson's testimony suggested that the invocation of rights preceded the statement at issue:. Casson testified that in response to Zuk's remarks, "Mr. Rivera indicated at that point that he did not wish to talk to us. He did not wish to waive his rights and he then – then he made a comment something to the effect that it doesn't matter what I say, I'm going to prison for the rest of my life anyway." Tr. 37.

      If Zuk's sequence of events is credited, it is the allegedly inculpatory statement itself that must constitute a waiver.  Viewed in the totality of the circumstances and in light of the presumption of against waiver, Rivera's statement does not evince a knowing and voluntary waiver of rights, chiefly because of the substance of the statement itself.  Rivera's statement itself—"I believe that no matter what I say, I will spend the rest of my life in jail"—may be viewed to express his belief that neither invocation nor waiver of the right to silence will allow him to evade the consequences of his predicament.  Apart from the fact that Rivera broke his silence to make it, I would be hard pressed to find that such an expression of futility manifests a

desire to speak with Agent Zuk; breaking a silence to articulate a desire not to speak cannot constitute a waiver of one's right to remain silent. Indeed it may be argued that Rivera's statement connotes just the opposite conclusion. This is particularly so because courts must resolve doubts <u>against</u> waiver of the rights delineated by Miranda, <u>United States</u> v. <u>Quiroz</u> 13 F.3d 505, 511 (2d Cir. 1993), and "a suspect need not rely on talismanic phrases or any special words to invoke his Fifth Amendment right to remain silent." <u>United States</u> v. <u>Ramirez</u>, 79 F.3d 298, 304 (2d Cir. 1996). Here, it is important that Rivera did not say, "I believe I will go to jail for the rest of my life," he said "I believe that <u>no matter what I say</u>, I will go to jail for the rest of my life." Thus, to the extent that Rivera's statement is ambiguous, its ambiguity suggests invocation of rights, not waiver of them. <u>Cf.</u> <u>United States</u> v. <u>Boykin</u>, 398 F.2d 483 (3d Cir. 1968) (defendant's statement "I might as well tell you about it" constituted waiver). In short, the only affirmative conduct here that can possibly be construed as a waiver is at most ambiguous and more fairly construed as inconsistent with an intent to waive his right to silence.

   That Rivera's statement is inconsistent with a waiver of rights is substantiated by Zuk's contemporaneous interpretation of it. Zuk responded to Rivera's statement by stating "so, to my understanding then, you don't wish to speak to me." Tr. 12. This follow-up question to clarify whether Rivera's statement was intended to be an exercise of rights was entirely proper. <u>See</u> <u>United States</u> v. <u>Ramirez</u>, 79 F.3d 298, 304 (2d Cir. 1996) ("[W]here a suspect has invoked his right equivocally or ambiguously, the officers are permitted to ask narrow questions only for the purpose of clarifying the ambiguity.") But the fact that Zuk interpreted Rivera's statement as an invocation of rights and sought clarification from Rivera further indicates that the statement was not consistent with a "course of conduct indicating waiver." <u>Butler</u> 441 U.S. at 373. Furthermore, the inconsistency in the testimony of Casson and Zuk, both of whom were present at the time, about whether Rivera's statement preceded or followed a more direct invocation of the right to silence suggests, albeit obliquely, that the two utterances were in fact part of a more fluid articulation of a single thought.

   Finally, Rivera's response to Zuk's query confirms that his statement was not intended as a waiver. Rivera confirmed that he did not want to speak with Zuk and he refused to sign the waiver. Again, while Zuk properly adhered to <u>Miranda's</u> protocols by ceasing further

8

interrogation, Rivera's unambiguous exercise of his right to silence only corroborates that his initial ambiguous statement was not intended as a waiver.[5]

The Government argued at the suppression hearing that after being informed of his Miranda rights, Rivera "chose to make a statement, arguably by way of invoking [his rights]" but nonetheless voluntarily.  Tr. 54.  In the Government's view, in the process of invoking his rights, Rivera "chose to say more" than was necessary to that purpose, but this does not make his statement inadmissible.  Id.  Although as a general rule voluntary statements preceded by the legally required warnings are admissible, see, e.g., United States v. Jaswal 47 F.3d 539, 542 (1995), where, as here, the statement is responsive to custodial interrogation and no other conduct by the suspect is consistent with an intent to waive his rights, a statement that is most plausibly interpreted as inconsistent with a waiver is not admissible as a "voluntary" or "spontaneous" statement.  Some affirmative statement or conduct consistent with a waiver is required, and here Rivera exhibited none.[6]  The record reflects only Rivera's silence and the statement that he seeks to suppress, the content of which is inconsistent with a waiver of the right

---

[5] The Court of Appeals' recent split decision in Plugh is the latest word in this Circuit on the import of ambiguous invocations of Miranda rights and the scope of the Supreme Court's holding in Davis v. United States, 512 U.S. 452 (1994).  In Davis, the Supreme Court held that, to be effective, a suspect's invocation of his right to counsel must be clear and unambiguous; "maybe I should talk to a lawyer" did not suffice. 512 U.S. at 462.  Separate and apart from the more obvious distinction with the facts of this case—Davis concerned the right to the presence of counsel, this motion concerns the right to remain silent—the majority in Plugh held that Davis applies only to reinvocation of Miranda rights after a waiver and "does not instruct courts how to analyze an initial invocation of one's Fifth Amendment rights following the Miranda warning where no waiver occurred."  Plugh, 576 F.3d at 142-43.  In dissent, Chief Judge Jacobs took exception to the majority's narrow reading of Davis, arguing that "Davis applies, as Davis says 'at any time during the interview.'" Id. at 148 (Jacobs, C.J, dissenting) (quoting Davis, 512 U.S. 458).  Irrespective of the disagreement, the majority's decision is the binding law of the Circuit.  Consequently, even if Davis does apply to invocation of the right to silence—a question other circuits answered affirmatively, see, e.g., United States v. Mills, 122 F.3d 346, 350-51 (7th Cir.), cert. denied, 522 U.S. 1033 (1997), but ours has left open see Ramirez, 79 F.3d at 305—under Plugh the Davis holding does not apply to my analysis of Rivera's statement which was not preceded by a waiver of rights.  Plugh, 576 F.3d at 142-43.  The applicable test is set forth in cases such as Butler and Scarpa:  the Government bears the burden to prove an implied waiver by pointing to "a course of conduct indicating waiver."  Butler, 441 U.S. at 373.

[6] Because Rivera's statement was responsive to custodial interrogation, it is not the type of "volunteered" or "spontaneous" declaration left untouched by Miranda and which are admissible without a finding of a waiver. Cf. United States v. Cota, 953 F.2d 753, 759 (2d Cir.1992) ("[Defendant's] subsequent statements . . . were . . . .not the product of custodial interrogation . . . [the defendant] was the one to initiate the discussion ...."); United States v. Annucci, No. 06 Cr. 982(BSJ), 2007 WL 1310156, at *5 (S.D.N.Y. May 3, 2007) ("The conversation that preceded Defendant's incriminating statement was initiated by the Defendant himself.")

to silence. The Government would have the statement that Zuk interpreted as an ambiguous invocation of rights operate as a waiver too. It cannot be both. Consequently, the Government fails to establish by a preponderance of the evidence that Rivera waived his rights under <u>Miranda</u> and his post-arrest statement must be suppressed.

### III.   CONCLUSION

For the foregoing reasons, Rivera's motion to suppress the post-arrest statement is GRANTED. The Clerk of the Court is directed to close this motion and remove it from my docket.

SO ORDERED
September 22 2009
New York, New York

_____
U.S.D.J